STATE OF NORTH CAROLINA v. EDELL WILLIS

No. 8210SC749

(Filed 1 March 1983)

1. **Arrest and Bail § 3.4— legality of arrest for narcotics offenses**

   An officer had reasonable grounds to believe that defendant was committing or had committed a narcotics offense and, therefore, lawfully arrested defendant without a warrant, where the officer received information from a confidential informant that defendant, a subject known to both the officer and the informant, would be delivering packages of heroin to several people at a certain location; past information from this informant had proven reliable and had led to convictions in approximately 25 cases; the officer and another officer drove to the area in an unmarked police car at about 10:30 p.m.; the officer saw a Cadillac rolling forward at a slow speed without its headlights on; as the police car passed the Cadillac, the officer recognized defendant as being the person who was sitting in the passenger seat; when the police car drove up behind the Cadillac, the officer saw defendant throw a white package from the Cadillac; when the officer jumped from his police car, defendant yelled, "Get out of here," and the Cadillac sped off; the Cadillac was stopped several blocks away; the second officer retrieved the package which had been thrown out of the Cadillac by defendant; large sums of money were found in the Cadillac and on defendant's person; and the second officer told the arresting officer that the recovered package contained a white powder substance.

2. **Searches and Seizures § 8— search incident to arrest—lawfulness of intensity**

   The intensity of a search of defendant's person as an incident to his lawful arrest for a narcotics offense, during which bundles of money were found in various parts of his clothing and four papers were found in his wallet, was reasonable and lawful, and the money and papers were lawfully seized and received into evidence.

3. **Criminal Law § 51— opinion testimony—failure to tender witness as expert**

   The fact that an officer was never tendered as an expert witness nor held by the court to be an expert witness did not prevent him from giving opinion testimony where it appeared from the record that he had acquired such skill

State v. Willis

that he was better qualified than the jury to form an opinion on the particular subject of his testimony.

**4. Criminal Law § 80— names on pieces of paper—identification by officer**

In a prosecution for felonious possession of heroin, the trial court properly ruled that an officer who was familiar with persons listed on pieces of paper found in defendant's wallet could identify each such person listed and explain his knowledge of that person. Furthermore, since the papers were taken directly from defendant's wallet and the defendant's own name appeared as addressee on one of the pieces of paper, the State was not required to prove who wrote the papers or made any of the markings thereon or any other type of authentication.

**5. Criminal Law § 102.6— prosecutor's jury argument—plausible inference from the evidence**

In a prosecution for felonious possession of heroin, the prosecutor's jury argument that, according to the testimony of two officers, persons whose names were written on papers found in defendant's wallet were known heroin users and dealers and that numbers beside the names of some of the persons represented a record of defendant's heroin sales merely suggested a plausible inference to be drawn from the evidence and was not improper.

**6. Criminal Law §§ 34.7, 34.8— evidence of other crimes—admissibility to show common plan or scheme, knowledge and intent**

In a prosecution for trafficking in heroin, bundles of money found in various parts of defendant's clothing and papers found in defendant's wallet which contained the names of known heroin users with numbers beside some of the names were relevant as tending to show a plan or scheme and a disposition by defendant to deal in heroin, to show that defendant had knowledge of the presence of heroin in a package which he threw from an automobile, and to show that defendant intended to possess and traffic in heroin.

**7. Narcotics § 4.7— trafficking in heroin by possession—failure to instruct on lesser offenses**

In this prosecution for trafficking in heroin by possessing between four and fourteen grams thereof, the trial court did not err in failing to charge the jury on the lesser included offense of simple possession of heroin where all of the evidence tended to show that the total weight of the mixture of white powder possessed by defendant was 13.2 grams and that the mixture contained approximately 30% of pure heroin.

**8. Criminal Law § 112.4— instructions on circumstantial evidence**

In a prosecution for felonious possession of heroin, the trial court properly refused to instruct on "no eyewitness testimony or direct evidence" where there was direct evidence of the offense through an officer's testimony that he saw defendant throw a package containing heroin from a car. Furthermore, the instruction given by the trial court on circumstantial evidence was sufficient although it was not in the language requested by defense counsel.

**9. Narcotics § 4— trafficking in heroin by possession—sufficiency of evidence**

    The State's evidence was sufficient for the jury to find defendant guilty of trafficking in heroin by possessing between four and fourteen grams thereof.

**10. Narcotics § 5— trafficking in heroin—cooperation with authorities—statute permitting more lenient sentence—constitutionality**

    The subsection of the heroin trafficking statute which permits the trial judge to impose a more lenient sentence on a defendant who provides substantial assistance in the identification, arrest or conviction of any accomplices, accessories, co-conspirators or principals, G.S. 90-95(h)(6), is not unconstitutional on the theory that it coerces a defendant to abandon his Fifth Amendment rights against self-incrimination by denying him sentencing leniency unless he cooperates with the authorities. Nor is the statute unconstitutionally vague in its use of the phrase "substantial assistance."

**11. Narcotics § 5— trafficking in heroin—mandatory minimum sentence—constitutionality**

    The mandatory minimum sentence and fine provision of a subsection of the heroin trafficking statute, G.S. 90-95(h)(5), does not violate a defendant's equal protection rights and the separation of powers clause of the North Carolina Constitution on the theory that it places impermissible legislative restraints on the judiciary and, in effect, places sentencing power in the hands of the prosecutor.

**12. Narcotics § 5— heroin trafficking statute—no violation of equal protection**

    The statute defining the offense of trafficking in heroin, G.S. 90-95(h)(4)a., does not violate a defendant's equal protection rights because it penalizes possession of a particular amount of any mixture containing heroin without regard to the percentage of heroin in the mixture.

APPEAL by defendant from *Battle, Judge.* Judgment entered 24 February 1982 in Superior Court, WAKE County. Heard in the Court of Appeals 19 January 1983.

    The jury convicted the defendant of feloniously possessing 4 to 14 grams of the controlled substance heroin in violation of G.S. 90-95(h)(4). Pretrial, the judge conducted a full evidentiary hearing on defendant's motion to suppress items seized without a search warrant following an asserted arrest of his person. Defendant contends that the search was without probable cause. The suppression motion was denied and the items were subsequently admitted into evidence.

    The State's evidence tended to show that on 22 June 1981, Raleigh police detective O'Shields received information from a

confidential informant that defendant, a subject known to both detective and informant, would be delivering packages of heroin to several people near Shirley's Restaurant and Lounge. Acting on this information, Officers O'Shields and Peoples of the Drugs and Vice Division drove to the area in an unmarked police car at about 10:30 p.m. on 22 June 1981. The officers saw a dark blue Cadillac in the middle of Florence Street, without headlights, rolling forward at a slow speed. As the police car passed the Cadillac, shining its headlights into the car, O'Shields recognized defendant, who was sitting in the passenger seat. The officers went around the block and drove up behind the Cadillac, which now was parked against the curb.

O'Shields saw defendant turn around and look out the back window of the Cadillac when the two vehicles were approximately three car lengths apart. As the Cadillac's passenger side door came open, two large interior lights at the back rear illuminated the interior. O'Shields could then clearly see defendant looking out the back window, and the officers were about a car length behind. The officers stopped. Before O'Shields could open his door, "Edell Willis stuck his right arm out of the vehicle, up under the vehicle, and threw a white package up under the car." O'Shields jumped out of the police car, and before O'Shields could go in front of his own vehicle, the defendant slammed the Cadillac door and yelled, "Go, go, go. Get out of here. Get out of here." The Cadillac sped off.

The package, or object thrown from the Cadillac, was pinpointed by O'Shields as lying four feet away from a pecan tree in front of a house on Florence Street with no other objects around. The package was bundled or rolled up and approximately three or four inches long in a manila, white, glassine bag and had white powder in it.

The officers followed the Cadillac for several blocks and then stopped it, removing the two men from the car. Peoples immediately returned to the location on Florence Street to pick up the package that had been thrown out by defendant.

In the search of the Cadillac, O'Shields recovered two large sums of money. In a money bag on the floor at the driver's feet was a total of $1,077.00. O'Shields was still searching the Cadillac

when Sgt. Peoples returned. Sgt. Peoples told Detective O'Shields that he had recovered a package of white powder substance and "he picked it up where they threw it out." Peoples secured the white powder in the trunk.

O'Shields placed defendant and Monroe, the driver of the Cadillac, under arrest for possession of heroin. Defendant was searched and a total of $7,064.10 was found in various places on him.

On 18 November 1981, a hearing was held on defendant's motion to suppress evidence. The judge denied the motion, concluding that there was probable cause, that once arrested there was a search of defendant's person incident to the arrest, and that the glassine bag was abandoned in the street and not the subject of the law of search and seizure.

On 23 February 1982 when the case came on for trial before Judge Battle, another hearing on the motion to suppress evidence was held and again the motion was denied. This hearing centered around four pieces of paper which were taken from the defendant's wallet the night of the arrest. The pieces of paper contained names of individuals with either telephone numbers or numerals noted beside them.

During the jury trial a *voir dire* hearing was held out of the presence of the jury regarding the search of the defendant's person and the relevancy of the four pieces of paper. Both Detective O'Shields and Sgt. Peoples testified. The *voir dire* evidence showed that O'Shields had been involved in the investigation of heroin trafficking in the City of Raleigh for approximately six years, and that based on that experience and his knowledge of heroin trafficking, heroin dealers, and heroin addicts, the amounts next to the names on the four pieces of paper from the wallet of the defendant were amounts of heroin that dealers had passed to the defendant. O'Shields made "a connection with the names there with the heroin trafficking in Raleigh." He had arrested four of those people, and four of them were in prison for heroin trafficking. He said he knew Miss D (also known to him as Dee Jones, Linda Shaw Jones, and Linda Evans), J. J. Young, Bobby Ray Cox, Peach Smith, Drake, Sam Man (who was known to him as Sammy Perry) and Johnny (who was known to him to be John-

ny Blalock) and related each to words or entries or notes on the pieces of paper. O'Shields testified on cross-examination that he looked at the papers then "in front of him and pretty much based on the information that I have gathered over the years as a narcotics officer, place an interpretation on these items as to who they are and what it means." He did not know who wrote the entries or when they were written. His interpretation of names came "from informants and with (him) talking with these people themselves telling me their names, their street names." As to the telephone numbers listed on the papers, he knew personally the numbers of Dee Jones and Sammy Perry.

Sgt. Peoples testified on *voir dire* as to his own understanding of the meaning of the names and numbers on the papers. He based his answers on about two years of investigation of heroin trafficking in Raleigh and an examination of the papers themselves. He explained the names he knew and that he had checked telephone numbers with Southern Bell as listed on the papers. He said: "I am making an assumption about these names and the people to whom they refer to. With regard to the figures that are written on these papers, it is based on experience in talking with addicts."

At the conclusion of *voir dire*, Judge Battle ruled that he would permit the officers, where they were personally familiar with the name on the piece of paper, to identify the person and explain their knowledge.

When again before the jury, O'Shields testified as to the money found and amounts, and as to the four pieces of paper. The money and papers were received into evidence over objection.

Upon further questioning by the State, O'Shields told the jury that he recognized certain names on the four pieces of paper. Those he identified were Miss D, J. J., Johnnie, B. Ray, Peach, Drake and S. Man. An example of one of his answers illustrates the nature of his testimony: "I recognize that name as a street dealer called Miss D or D. Jones. They call her just D. I know her as Linda Shaw Jones. I have arrested her and searched her twice and she is now in prison for selling heroin." O'Shields further testified that he knew the home phone number of Miss D on one

of the papers, and that he had talked with her at this number on numerous occasions.

Sgt. Peoples, in testifying before the jury, related that before he first left the Florence Street location and pursued the Cadillac, "I saw the white package on the ground." In returning to the scene to retrieve the package, he found it out in the street approximately four feet away from the curb with nothing else around it, and in the near vicinity of a tree and of 705 Florence Street. The elapsed time was approximately 3 to 5 minutes between first seeing the package and retrieving it.

Defendant presented the testimony of one witness, Janet Graves. She testified that she lived at 707 Florence Street and was on her front porch at the time the Cadillac was first parked at the curb and when the police car first appeared. On direct, she said that "no door to the Cadillac came open. Nor did any door to the police car come open at that time. No one got out of the police car. . . . No one threw anything out of the Cadillac." On cross-examination she testified, "I watched the policeman and I watched the Cadillac and I was trying to figure out what was going on but I didn't see the door open to the Cadillac but I guess I couldn't really say that it didn't open." She did not see anybody throw anything on the street.

*Attorney General Edmisten by Assistant Attorney General Joan H. Byers for the State.*

*Loflin & Loflin by Thomas F. Loflin, III; Of Counsel, Eagles, Hafer & Hall by Kyle S. Hall for defendant appellant.*

BRASWELL, Judge.

Under his multi-faceted assignments of error defendant argues that there was no probable cause for his warrantless arrest or search of his person, that currency and papers seized from his person were improperly admitted into evidence, that certain jury instructions were improper, that his motions to dismiss and nonsuit should have been allowed, and that the controlled substances trafficking statute is unconstitutional.

We hold that probable cause existed for the warrantless arrest, search of the person incidental to arrest, seizure of money

from the person, and seizure of four pieces of paper from the defendant's wallet.

When a warrantless arrest is made upon the basis of probable cause, the arrest is constitutionally valid. The framework for a determination of the existence of probable cause in any case is conditioned upon " 'whether at that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " *State v. Bright*, 301 N.C. 243, 255, 271 S.E. 2d 368, 376 (1980), quoting *Beck v. Ohio*, 379 U.S. 89, 91, 13 L.Ed. 2d 142, 145, 85 S.Ct. 223, 225 (1964).

[1] In our case Detective O'Shields, a 10-year veteran of the Raleigh Police Department, received information from a confidential informant on 22 June 1981, the same date of the arrest, that the defendant, a subject known to both officer and informant, would be delivering packages of heroin to several people in the vicinity of South and South Saunders Streets at Shirley's Restaurant and Lounge. Past information from this informant had proven reliable and had led to convictions in approximately 25 cases, of which 6 or 7 of them had been in the previous 6 months. The detective had dealt with this informant many times.

On the basis of this intelligence, Detective O'Shields, accompanied by Sgt. Peoples, drove in an unmarked car to the vicinity of South and South Saunders Streets at approximately 10:30 p.m. After circling the area twice, the officers met a Cadillac automobile on Florence Street. A subsequent chase of the Cadillac for a block to a block and a half led to the arrest of the defendant, who was a passenger in the Cadillac, at the rear parking lot of Shirley's Restaurant and Lounge.

The facts and circumstances of the encounter with the Cadillac, as more specifically related under the facts of this opinion; what was happening at the moment of the encounter; the fresh knowledge from the confidential informant; the proven past reliable knowledge through 25 convictions; the self-verifying details of the officers finding the defendant in the exact vicinity where the informant had said the defendant would be delivering packages of heroin; the defendant being one of the two occupants of the Cadillac; the throwing of a glassine package by the defend-

ant from the car; the defendant yelling, "Go, go, go. Get out of here. Get out of here"; the way and manner of the automobile leaving its position on Florence Street; the way the defendant, during the chase, "was all down in front of the vehicle making all sorts of motions with his hands"; the Cadillac being in motion at night without lights; the leaving and prompt return by Sgt. Peoples to the place where the package had been thrown from the Cadillac; the retrieval of the glassine package from the exact same area from which an object had been thrown by defendant and prompt return with the package to the parking lot of Shirley's Restaurant; the white powder appearance of the contents of the package—all of which, when taken en masse, were sufficient to warrant a prudent man in believing that defendant had committed or was committing a criminal offense in violation of the North Carolina Controlled Substances Act. O'Shields possessed a reasonable ground for belief that defendant was committing or had committed an offense, justifying the arrest of the defendant without a warrant. *State v. Bright, supra.* As said in *Adams v. Williams,* 407 U.S. 143, 147, 32 L.Ed. 2d 612, 617-18, 92 S.Ct. 1921, 1924 (1972), "One simple rule will not cover every situation. Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized. But in some situations—for example, . . . when a credible informant warns of a specific impending crime—the subleties of the hearsay rule should not thwart an appropriate police response." O'Shields was acting and "relying on something more substantial than a casual rumor." *Spinelli v. United States,* 393 U.S. 410, 416, 89 S.Ct. 584, 589, 21 L.Ed. 2d 637, 644 (1969).

Our case is similar to *McCray v. Illinois,* 386 U.S. 300, 18 L.Ed. 2d 62, 87 S.Ct. 1056 (1967). In affirming a possession of heroin conviction, the court in *McCray* noted the following evidentiary summary of the officers' testimony:

"Officer Jackson stated that he and two fellow officers had had a conversation with an informant on the morning of January 16 in their unmarked police car. The officer said that the informant had told them that the petitioner, with whom Jackson was acquainted, 'was selling narcotics and had narcotics on his person and that he could be found in the vicinity of 47th and Calumet at this particular time.' Jackson said

that he and his fellow officers drove to that vicinity in the police car and that when they spotted the petitioner, the informant pointed him out and then departed on foot. Jackson stated that the officers observed the petitioner walking with a woman, then separating from her and meeting briefly with a man, then proceeding alone, and finally, after seeing the police car, 'hurriedly walk[ing] between two buildings.' 'At this point,' Jackson testified, 'my partner and myself got out of the car and informed him we had information he had narcotics on his person, placed him in the police vehicle at this point.' Jackson stated that the officers then searched the petitioner and found the heroin in a cigarette package.

Jackson testified that he had been acquainted with the informant for approximately a year, that during this period the informant had supplied him with information about narcotics activities 'fifteen, sixteen times at least,' that the information had proved to be accurate and had resulted in numerous arrests and convictions."

*Id.* at 302-03, 18 L.Ed. 2d at 65-66, 87 S.Ct. at 1058.

[2] We also hold that the intensity of the search of the person of the defendant was lawful and that the money and papers were properly seized and received into evidence. Judge D. B. Herring, Jr., the trial judge who heard the pretrial motion to suppress, based upon facts found, and which we also find to be fully supported in the record, concluded that the search here did not take place until after a lawful arrest, and that "once arrested a search, incident to the arrest, of the defendant's person . . . was lawful and proper." It was during the search that the money was found in bundles in various parts of his clothing and the four papers were found in his wallet. As held by the United States Supreme Court in *United States v. Robinson*, 414 U.S. 218, 235, 38 L.Ed. 2d 427, 440-41, 94 S.Ct. 467, 477 (1973),

"A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick ad hoc judgment which the Fourth Amendment does not require *to be broken down in each instance into an analysis of each step in the search. The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover

evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."

The issue of the lawful seizure of a wallet, and other items, from a defendant in a drug case was discussed in *United States v. House*, 604 F. 2d 1135, 1142 (8th Cir. 1979), *cert. denied*, 445 U.S. 931, 63 L.Ed. 2d 764, 100 S.Ct. 1320 (1980):

"The government argues that the jacket, wallet, keys, and car ownership papers were seized to show constructive possession by appellant of drugs or money. Over $3,000 was found in the wallet; drugs were found in the jacket, a locked overnight bag in the bedroom closet, and the car. The government argues that these items constituted 'mere evidence' that would aid in a particular apprehension or conviction. [Citation omitted.] We find the government's position to be well taken. Moreover, the car keys and wallet were seized incident to appellant's lawful arrest."

The defendant makes a specific six-prong attack on the admission into evidence of the currency taken from his person and the automobile, and to the admission into evidence of the four pieces of paper taken from defendant's wallet, contending prejudicial error, as follows:

"(1) O'Shields's belief as to the meaning of the papers was an impermissible assertion of an opinion by a nonexpert witness with no firsthand knowledge of the facts about which he was testifying.

(2) The documents, and the interpretations that O'Shields ascribed to them, were attributed to the Defendant in the absence of any evidence to show that they were written by the Defendant.

(3) The documents and the meaning given them by O'Shields were admitted for the purpose of proving the truth of the meaning that O'Shields had given them and thus are hearsay.

(4) The purpose for the introduction of this evidence was to create the impression in the minds of the jurors that the Defendant had engaged in a variety of heroin transactions for which he had not been charged and was not on trial. The admission of the evidence for that purpose constituted an attack upon the Defendant's character during the State's case in chief and without the Defendant having first put his character in issue.

(5) The money, documents, and the testimony about the documents were offered to conjure up the implication that the Defendant was engaged in the sale of heroin, which is irrelevant to the offense of *possession* of heroin, for which the Defendant was on trial, and was calculated to create substantial prejudice against the Defendant in the minds of the jurors.

(6) The documents and currency were seized from the Defendant without probable cause in violation of the United States Constitution and Chapter 15A of the North Carolina General Statutes and were, therefore, inadmissible at the Defendant's trial. For each of these reasons the Court erred. For any of them the Defendant is entitled to a new trial."

[3]  We merge our discussion of these arguments by first considering whether O'Shields was an expert or a lay witness as to his testimony about the papers. The uncontradicted evidence shows that Detective O'Shields had been a Raleigh police officer for 10 years. He had experience as a patrolman with the Selective Enforcement Unit and for a year and a half with the Drugs and Vice Unit. His present duties were working with narcotics and vice cases. On *voir dire* O'Shields stated that he was trained by attending several drug identification schools and search warrant classes, by working drug campaigns with the investigative division, by working on the east and south sides of Raleigh and by his previous experience on the Selective Enforcement Unit. He had been involved in the investigation of heroin trafficking in the City of Raleigh for approximately six years. Thus, it appears from the

record that through his study, experience and personal knowledge of the area, O'Shields had "acquired such skill that he was better qualified than the jury to form an opinion on the particular subject of his testimony." *Maloney v. Hospital Systems*, 45 N.C. App. 172, 177, 262 S.E. 2d 680, 683, *disc. rev. denied*, 300 N.C. 375 (1980), citing *State v. Johnson*, 280 N.C. 281, 286, 185 S.E. 2d 698, 701 (1972). The mere fact that O'Shields was never tendered as an expert witness nor held by the court to be an expert witness, does not in fact prevent him, otherwise qualified in the record, from giving his opinion. It is the substance of the background evidence of qualifications in the record and not any magic words spoken by the judge that determine if the witness may give opinion testimony. In *State v. Mitchell*, 283 N.C. 462, 196 S.E. 2d 736 (1973), there was no formal ruling that a fingerprint identification witness was an expert, but the record showed that he was better qualified than the jury to form an opinion on the subject. *See State v. Covington*, 22 N.C. App. 250, 206 S.E. 2d 361 (1974); and 1 Brandis on North Carolina Evidence § 133, fn. 6, p. 515 (1982). In *Covington, supra*, at 253, 206 S.E. 2d at 363, it was held proper to allow a Durham Vice Squad officer with years of vice squad experience to describe "use of narcotics paraphernalia and cutting of heroin." *Also see, State v. Clark*, 30 N.C. App. 253, 226 S.E. 2d 398 (1976). "The absence of a record finding of qualification is not ground for challenging the ruling implicitly made in allowing him to testify. At least if the record indicates that such a finding could have been made, it will be assumed the judge found him qualified, . . ." *Brandis, supra*, at p. 517.

[4] There was a *voir dire* as to O'Shields' actual interpretation of the names, figures, and telephone numbers appearing on the four pieces of paper taken from defendant's wallet. The trial judge properly concluded that during the *voir dire* itself, O'Shields had gone too far in giving his opinions. However, we hold that Judge Battle properly ruled that where the officers were personally familiar with the name on the piece of paper, the officer could identify the person and explain his knowledge of same. Since the papers were taken directly from defendant's wallet and the defendant's own name appeared as addressee on one of the pieces of paper, a receipt for the rental of post-hole diggers, it was not required that the State prove who wrote the papers or made any of the markings on them or any other type of authentication. The

fact that the papers were found in his wallet indicates that the defendant considered the papers important to himself.

[5]  Coupled with his complaint of O'Shields' opinion evidence is an allegation of improper comment by the district attorney in his closing jury argument. We agree with the State that since the defense counsel's argument is not brought forward in the record, the defendant ought not to be allowed to object to the argument of the State because the argument might well have been in response to comments made by the defendant's counsel. *See* G.S. 15A-1241(b). We have nevertheless examined the challenged comment and find it to be without merit. The district attorney here had argued that based on the testimony of O'Shields and Peoples,

> "[T]hat what we have here is Edell Willis' records of his heroin sales. We have got the names of the people who you now know, according to the evidence testified by Detective O'Shields, are known and convicted heroin users, with each one of them having next to them certain numbers, nine hundred, five hundred, seven hundred fifty, nine hundred, three hundred, five hundred fifty, etc. What is that? Doesn't the evidence show, ladies and gentlemen, that Edell Willis had just made sales of certain amounts of heroin for certain prices that he now had with him. Did he sell a package of heroin for five hundred dollars to Miss D., to Young J.J. two packages, one nine hundred dollar package and a five hundred dollar package? What does this say? What does the money say? Isn't that exactly what was going on? Or is that just one of those coincidental things that point to innocence that Mr. Hall was talking about."

The defendant's objection to this argument has already been answered in *United States v. Washington*, 677 F. 2d 394, 396 (4th Cir.) *cert. denied*, --- U.S. ---, 74 L.Ed. 2d 105, 103 S.Ct. 120 (1982), as follows:

> "The defendants also complain about the prosecutor's statement to the jury that matching names and figures in the address books and slips of paper found on the two defendants give 'an idea of how drug dealers do business, the names of customers and the amounts of money.' The defendants argue that, since no expert witness had testified on the business practices of drug dealers, this comment went beyond the

evidence in the case. We disagree. The prosecutor was merely suggesting a plausible inference to be drawn from the evidence. Such suggestions are proper. *See United States v. Welebir*, 498 F. 2d 346, 351-52 (4th Cir. 1974)."

The defendant argues further that O'Shields' testimony that he was "making an assumption" as to the identification of names, nicknames, and figures violates the hearsay rule, was an attack upon the defendant's character, and tended to show that the defendant was engaged in other offenses which were not relevant to the crime charged. We do not agree.

[6] The defendant was indicted under G.S. 90-95(h)(4). The opinion by O'Shields was relevant and admissible as evidence concerning defendant's guilty knowledge of what he possessed. The trafficking in drugs statute is aimed at an offender who is facilitating a large scale flow of drugs, and the General Assembly aimed to deal with such an offender. Our Court held in *State v. Richardson*, 36 N.C. App. 373, 375, 243 S.E. 2d 918, 919 (1978), that "In drug cases, evidence of other drug violations is relevant and admissible if it tends to show plan or scheme, disposition to deal in illicit drugs, knowledge of the presence and character of the drug, or presence at and possession of the premises where the drugs are found." Defense counsel could have, but did not, request the trial judge to instruct the jury as to the limited purpose for which this evidence was received. *Id. Richardson* was cited with approval by our Court in *State v. Haynes*, 54 N.C. App. 186, 282 S.E. 2d 830 (1981), a case where the officer was permitted in a drug case "to identify certain papers which had been removed from defendant's billfold at the time of arrest and to testify as to their contents." *Id.* at 186, 282 S.E. 2d at 831. Here, the four pieces of paper and the bundles of money were relevant and tended to show a plan or scheme to traffic in drugs and a disposition of the defendant to deal in illicit drugs; that defendant had knowledge of the presence of heroin in the package abandoned and thrown by him from the automobile; and that it was defendant's intent to possess heroin and traffic in same.

[7] By his third question the defendant contends that the trial judge erred in its failure to charge the jury on the lesser-included charge of simple possession of a controlled substance, or any other lesser offense. This contention is without merit.

Only when there is evidence of a lesser-included offense is the judge required to charge on a lesser offense. All of the evidence, if believed — and credibility is a jury function — shows the total weight of the mixture of white powder to be 13.2 grams and that the mixture contained approximately 30% of pure heroin. The amount was well over the lower limit of 4 grams so as to fall within the trafficking statute. The fact that the mixture was analyzed to be 30% pure heroin instead of 100% pure heroin is not controlling. So long as the quantity of the mixture in which the percentage of heroin is present is of a weight of 4 grams or more, but less than 14 grams, this aspect of the controlled substances law has been satisfied. *State v. Tyndall*, 55 N.C. App. 57, 284 S.E. 2d 575 (1981). There was no evidence presented from which a trial judge could legitimately fashion a charge for a lesser offense. *State v. Summitt*, 301 N.C. 591, 273 S.E. 2d 425, *cert. denied*, 451 U.S. 970, 68 L.Ed. 2d 349, 101 S.Ct. 2048 (1981); *State v. Coats*, 46 N.C. App. 615, 275 S.E. 2d 486, *affirmed*, 301 N.C. 216, 270 S.E. 2d 422 (1980).

[8] The judge's charge on circumstantial evidence is the fourth question presented for review. Although the judge did instruct the jury on circumstantial evidence, defendant contends that the instruction was not full and complete and did not comply with the one requested by defendant.

The defendant had requested that the judge use N.C.P.I. Crim. 104.05 (no eyewitness testimony or direct evidence) and that the judge instruct on the two kinds of circumstantial evidence, links in a chain and strands of a rope, so as to put the jury "in a position to recognize either kind if it existed." Defendant also requested a more detailed and thorough explanation of "hypothesis" of guilt or innocence. The actual instruction given is as follows:

> "Circumstantial evidence is evidence of facts from which other facts may logically and reasonably be deduced. Circumstantial evidence is recognized and accepted proof in a court of law. However, before you may rely upon circumstantial evidence to find the defendant guilty in this case you must be satisfied beyond a reasonable doubt that the circumstantial evidence relied upon by the State either alone or together with any direct evidence points unerringly to the

defendant's guilt and excludes every other reasonable hypothesis."

Since there was direct evidence of defendant's guilt through O'Shields' testimony of seeing the defendant physically throw from his hand the package later identified as containing heroin, the trial judge was correct in refusing to charge on "no eyewitness testimony or direct evidence." The actual charge quoted above is complete in itself and supported by the evidence in the case. The trial judge is not required to use the same language requested by counsel, even though the language used could have included more details. *State v. Sledge*, 297 N.C. 227, 254 S.E. 2d 579 (1979); *State v. Monk*, 291 N.C. 37, 229 S.E. 2d 163 (1976). As noted by our Supreme Court in *Sledge*, reiterating what it had earlier stressed in *State v. Lowther*, 265 N.C. 315, 318, 144 S.E. 2d 64, 67 (1965), "[n]o set form of words is required which the court must use to convey to the jury the rule relating to the degree of proof required for conviction on circumstantial evidence in a criminal case." *State v. Sledge, supra*, at 234, 254 S.E. 2d at 584. We conclude, as did the court in *Sledge*, that there is no reasonable cause to believe that the jury was misled or misinformed by the charge as given.

[9] Another assignment of error is the denial of defendant's motion to dismiss at the close of the State's evidence and at the close of all the evidence, and denial of nonsuit. He contends that the evidence presented was insufficient to convict defendant as a matter of law.

After giving full consideration to all of the evidence, including the testimony of the one witness for the defendant, we find this assignment to be without merit. There was substantial evidence of all of the elements of the offense. *State v. Smith*, 40 N.C. App. 72, 252 S.E. 2d 535 (1979).

[10] In his fifth assignment of error defendant attacks the constitutionality of G.S. 90-95(h)(4)a., (5) and (6) which provide:

> "(4) Any person who sells, manufactures, delivers, transports, or possesses four grams or more of opium or opiate, or any salt, compound, derivative, or preparation of opium or opiate . . . including heroin, or any mixture containing any such substance, shall be guilty of a felony

which felony shall be known as 'trafficking in opium or heroin' and if the quantity of such substance or mixture involved:

a. Is four grams or more, but less than 14 grams, such person shall, upon conviction, be punished by imprisonment for not less than six years nor more than 15 years in the State's prison and shall be fined not less than fifty thousand dollars ($50,000);

* * * *

(5) Notwithstanding any other provision of law, except as provided in G.S. 90-95(h)(6), any person who has been convicted of a violation of this subsection shall serve the applicable minimum prison term provided by this subsection before either unconditional release or parole.

(6) A person sentenced under this subsection is not eligible for early release or early parole if the person is sentenced as a committed youthful offender and the sentencing judge may not suspend the sentence or place the person sentenced on probation. However, the sentencing judge may reduce the fine, or impose a prison term less than the applicable minimum prison term provided by this subsection, or suspend the prison term imposed and place a person on probation when such person has, to the best of his knowledge, provided substantial assistance in the identification, arrest, or conviction of any accomplices, accessories, co-conspirators, or principals if the sentencing judge enters in the record a finding that the person to be sentenced has rendered such substantial assistance."

Defendant argues that subsection (6) coerces a defendant to abandon his Fifth Amendment rights against self-incrimination by denying him sentencing leniency unless he cooperates with the authorities. In *State v. Benitez*, 395 So. 2d 514 (Fla. 1981), the Florida Supreme Court considered the constitutionality of a statute similar to ours and held that:

"Nothing in the statute suggests that 'substantial assistance' must incriminate the defendant of crimes other than those for which he has already been convicted (and for

which no fifth amendment privilege is obviously necessary). We acknowledge the risk of prosecution in other jurisdictions. Nonetheless, a defendant need not invoke [N.C. subsection (6)], as nothing in the statute is compulsive. [Citation omitted.] Putting a defendant to a difficult choice is not necessarily forbidden by the fifth amendment. [Citation omitted] . . . . No constitutional deprivation results if a defendant elects to reap the benefits of [subsection 6]."

*Id.* at 519-20.

We agree with the reasoning of the Florida Supreme Court and reject defendant's argument on this issue. We also find without merit defendant's contention that the phrase "substantial assistance" is unconstitutionally vague in defining a convicted defendant who is eligible for leniency in sentencing. We again agree with the analysis of this issue in *Benitez*:

"Being a description of a *post-conviction* form of plea bargaining rather than a definition of the crime itself, the phrase 'substantial assistance' can tolerate subjectivity to an extent which normally would be impermissible for penal statutes. [Citation omitted.] The contested phrase, in any event, is susceptible of common understanding in the context of the whole statute. [Citation omitted.] There is no due process infirmity."

*Id.* at 518-19.

We adopt the language in the *Benitez* decision and hold that defendant's attack on the constitutionality of subsection (6) cannot be sustained.

[11] We likewise reject defendant's argument that the mandatory minimum sentence and fine provision of subsection (4) violates his equal protection rights and the separation of powers clause of the N.C. Constitution because it "places impermissible legislative restraints on the judiciary and, in effect, also places sentencing powers in the hands of the prosecutor, who is a member of the executive branch." It is well-established that the legislature has exclusive power to prescribe the punishment for crimes. *Jernigan v. State*, 279 N.C. 556, 184 S.E. 2d 259 (1971); *State v. Vert*, 39 N.C. App. 26, 249 S.E. 2d 476 (1978), *cert. denied*, 296 N.C. 739, 254 S.E. 2d 181 (1979). The function of the court in the punishment of crimes is to determine whether an accused is guilty or innocent and, if guilty, to pronounce the penalty prescribed by the legislature. *Jernigan v. State, supra.*

[12] Defendant next contends that section (4)(a) is a violation of his equal protection rights because it penalizes possession of a particular amount of any mixture containing heroin without regard to the percentage of heroin in the mixture. The holding in *State v. Tyndall, supra,* is dispositive on this issue. In *Tyndall* this Court discussed the rational relationship between proscribing amounts of a mixture without reference to the percentage of drugs and the legitimate State interest in protecting the public welfare. The harsh penalties prescribed in the North Carolina Controlled Substances Act, G.S. 90-86 *et seq.,* represent an attempt by the legislature to deter large scale distribution of drugs and thereby to decrease the number of people potentially harmed by drug use. *Id.*

We cannot agree with defendant's construction of these statutes and hold that G.S. 90-95(h)(4)a., (5) and (6) are not violative of the United States or North Carolina Constitutions. We therefore overrule defendant's fifth assignment of error.

We conclude after a thorough examination of all of the evidence and assignments of error that the defendant received a trial without prejudicial error.

No error.

Chief Judge VAUGHN and Judge WELLS concur.